Docket No. 103859.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. BLAKE A. HEIDER, Appellant.

*Opinion filed May 22, 2008.*

JUSTICE FREEMAN delivered the judgment of the court, with opinion.

Justices Fitzgerald, Kilbride, and Burke concurred in the judgment and opinion.

Chief Justice Thomas dissented, with opinion, joined by Justices Garman and Karmeier.

Justice Karmeier also dissented, with opinion, joined by Chief Justice Thomas and Justice Garman.

## OPINION

In May 2003 defendant Blake Heider pleaded guilty to one count of predatory criminal sexual assault ( 720 ILCS 5/12–14.1(a)(1) (West 2002)) arising from an instance of sexual contact between defendant, who was 19 years old and mentally retarded, and D.R., a 12-year-old female. During the sentencing hearing, the State requested that defendant be sentenced to six years' imprisonment, the statutory minimum for a Class X felony (730 ILCS 5/5–8–1(a)(3) (West 2002)). The circuit court of Woodford County sentenced

defendant to 10 years' imprisonment. Defendant filed a motion to reconsider sentence, which the court denied. A divided appellate court affirmed defendant's conviction and sentence. No. 4–04–0932 (unpublished order under Supreme Court Rule 23). This court allowed defendant's petition for leave to appeal. 210 Ill. 2d R. 315. For the reasons set forth below, we reverse the judgment of the appellate court.

## BACKGROUND

The indictment alleged three violations of section 12–14.1(a)(1) of the Criminal Code of 1961 (Code) (720 ILCS 5/12–14.1(a)(1) (West 2002)). Section 12–14.1(a)(1) provides: "(a) The accused commits predatory criminal sexual assault of a child if: (1) the accused was 17 years of age or over and commits an act of sexual penetration with a victim who was under 13 years of age when the act was committed." According to counts I and III of the indictment, defendant twice placed his finger in D.R.'s vagina–once on October 31, 2002, and again on March 15, 2003. Count II of the indictment alleged that, sometime between October 31, 2002, and January 1, 2003, defendant placed his penis in D.R.'s mouth. Defendant, who was born on October 20, 1983, was 19 years old at the time of each of these alleged incidents. D.R., who was born on August 16, 1990, was 12 years old.

In a statement to police describing her relationship with defendant, D.R. stated that her friend "hooked [defendant and her] up" during the summer of 2002. Defendant was initially hesitant about dating D.R., but her friend "talked him into it." At first defendant and D.R. would "hang out and talk," but after a couple of weeks they began kissing and holding hands. On October 31, 2002, the date of the first incident alleged in the indictment, defendant and D.R. were at a park kissing and holding hands when D.R. fell to the ground. After she fell, they began kissing again and defendant put his hand in D.R.'s pants. He inserted his finger in D.R.'s vagina and "rubb[ed] his hands up and down" for a couple of minutes.

The next incident alleged in the indictment occurred in November or December of 2002. D.R. stated that she and defendant were parked in his father's car and were talking and kissing, and defendant asked

D.R. if she wanted to perform oral sex on him. D.R. told the police that she "didn't know what to say" because she did not know if she was "ready for this or not." Defendant told D.R. it was her decision–it was "up to [her] if [she] want[ed] to or not"–and she eventually consented. D.R. acknowledged that, during this incident, defendant's penis was in her mouth, but she said there was no ejaculation. Defendant then drove D.R. home.

The third incident alleged in the indictment took place on March 15, 2003, at a residence where D.R. was babysitting. D.R. told the police that two of her friends came to the house at about 7 p.m., followed by defendant. The four of them sat and talked for a while, and D.R. then went into the bedroom to put the baby in her crib. Defendant came into the bedroom with her and sat down on the bed next to the crib. After D.R. put the baby into the crib, defendant pulled D.R. onto the bed and they began kissing. Defendant put his hand in D.R.'s pants and, similar to the first incident, put his finger in D.R.'s vagina. They then joined the others in the next room. D.R.'s friends then left, followed by defendant. Shortly thereafter, D.R.'s mother arrived at the house where D.R. was babysitting. According to D.R., a neighbor had noticed D.R.'s friends at the house and had called D.R.'s mother.

D.R.'s mother obtained a court order of protection against defendant. In October 2003, defendant violated the order of protection by meeting and talking with D.R. in a public park. Defendant was subsequently convicted of unlawful violation of an order of protection and was sentenced to 24 months' probation.

In August 2004, pursuant to a fully negotiated plea agreement,[1] defendant pleaded guilty but mentally ill to count I of the indictment for predatory criminal sexual assault. In return, the State entered a *nolle prosequi* on the remaining counts and recommended a sentence of six years, the statutory minimum. The following month the circuit court conducted a sentencing hearing. No witnesses were presented,

---

[1] In a fully negotiated plea agreement, the defendant agrees to plead guilty in exchange for the State's dismissal of other charges and a specific sentencing recommendation by the State. See *People v. Lumzy*, 191 Ill. 2d 182, 185-86 (2000).

but the record contained a presentence investigation report (PSI) with an addendum. The PSI and addendum included, among other things, the aforementioned statement by D.R. to the police; a September 2000 social developmental study and psychological report by the Woodford County Special Education Association; a psychological evaluation of defendant in 2003 by Dr. Joel Eckert, the defense psychologist; and 17 letters in support of defendant from family members, friends, neighbors, and various school personnel including teachers, the junior-senior high school principal, and the district superintendent. The record also included a forensic report prepared in 2004 by Dr. Robert Chapman, a State-retained psychiatrist.

According to the documents available to the circuit court prior to sentencing, defendant was enrolled in early childhood education as a speech- and language-impaired student in September 1987, when he was three years old. In the spring of 1989, his status was changed to learning disabled with a secondary disabling condition of speech and language impairment. Once he started school, he was given special education services beginning in the first grade and continuing through the twelfth grade. In the first grade, defendant was held back a year, apparently because he was a "slower learner."

In July 1999, the summer before his freshman year in high school, defendant was diagnosed with B-cell type leukemia. He was treated at St. Jude's Hospital in Memphis, Tennessee, from July to December 1999, and apparently missed much of his freshman year in school. Defendant graduated from high school in May 2003. His cancer is now in remission.

Defendant told Eckert, the defense psychologist, that D.R.'s parents spoke to defendant about his relationship with D.R. on three occasions in late 2002, prior to the March 2003 order of protection. According to defendant, they told him to stay away from D.R. Defendant added that his own parents "weren't very happy" about his relationship with D.R.

Other than his convictions for predatory criminal sexual assault and unlawful violation of an order of protection, defendant's prior history–as of September 2004, the date of the PSI–included only traffic violations such as speeding, disregarding a stop sign and violation of the seat belt provisions of the Illinois Vehicle Code.

Eckert's report was based, in part, on his interview with defendant in August 2003 and on a number of tests, including the Wechsler Adult Intelligence Scale–Third Edition. Eckert estimated defendant's level of cognitive functioning to be within the borderline impaired range. Defendant's judgment, insight and ability to reason abstractly were all estimated to be mildly impaired, primarily because of defendant's limited cognitive abilities.

Eckert noted that defendant's nonverbal cognitive skills were "significantly better developed" than his verbal skills. Regarding defendant's verbal skills, Eckert stated that defendant's verbal IQ, receptive-language skills, word-recognition skills, and reading-comprehension skills were "all extremely poorly developed." Indeed, defendant's receptive-language skills "suggest that he comprehends information spoken to him[ ] at about the level of a ten year old." Eckert also opined that defendant was functionally illiterate. He explained that the common definition of functional literacy requires at least a fifth-grade reading-comprehension level. According to Eckert, defendant's reading comprehension was at about the fourth-grade level.

Eckert concluded, in addition, that defendant was "extremely immature and naive." Eckert explained that defendant's level of maturity probably could best be understood as matching that of his receptive-language skills, which, as noted, were at about the level of a 10-year-old. In Eckert's view, defendant's emotional maturity was about the same as that of D.R.

Finally, Eckert stated that, in his professional opinion, defendant did not possess "the intellectual capacity to understand that his conduct with [D.R.] was criminal, simply based on their chronological age difference." Eckert added: "I am not at all convinced that [defendant] even currently understands why his relationship with [D.R.] was criminal."

The report issued by Chapman, the State-retained psychiatrist, was based, in part, on interviews with defendant in March 2004. With regard to defendant's mental functioning, Chapman reached a conclusion similar to Eckert's. Chapman diagnosed defendant as borderline mentally retarded with a learning disorder. According to Chapman, defendant described his reading as "poor" and said he could not read sentences. Chapman stated that defendant was able to

read a simple sentence "but demonstrated a lack of understanding of the meaning."

Chapman disagreed with Eckert's conclusion regarding defendant's ability to appreciate the criminality of his conduct. Chapman opined that defendant "did not suffer a mental disorder or defect that caused him to lack the capacity to appreciate the criminality of the behavior leading to the present charge of Predatory Criminal Sexual Assault."

Defendant's difficulties, both academic and social, were reflected in many of the letters that were written in his support. A teacher's aide wrote that defendant "had trouble processing and retaining information." Another letter writer, a family friend who tutored defendant when he was being treated for cancer, noted that defendant "had difficulty with his school work (he had always gotten special education help in school)." She added that, as defendant grew older, "it was very noticeable that he was not maturing socially or emotionally like the rest of his friends and classmates." Defendant's high school principal wrote that defendant "struggled in his classes" and "[h]is educational level was far below grade-level." According to the principal, defendant "had great difficulty in many areas of his education, especially with reading, writing, comprehension, and math." The principal also noted, as did several other letter writers, that defendant tended to socialize with students younger than his own age. The principal wrote:

> "During the two school years that I had contact with [defendant] in school, he rarely socialized with students of his age. His friends were much younger age-wise, but at similar social, emotional, and maturity levels. *** [I]t seemed that [defendant] felt more comfortable talking with these students and spending time with them. Because of [defendant's] social, emotional, and maturity levels, he was spending time with students who were very much like him."

Defendant was also described in various letters as polite, caring, nonaggressive and willing to help others. With regard to his behavior in school, defendant was described as someone who took his school work seriously and tried his best in spite of his difficulties.

At the sentencing hearing, the State acknowledged that defendant was "slower than some" but argued that he nevertheless understood the criminality of his conduct and should be held responsible for it. After noting the seven-year difference in age between defendant and D.R., the State asked the court, "on behalf of [D.R.] and her family," to impose a sentence of six years' imprisonment. This sentence, the statutory minimum for a Class X felony, was the term the parties had agreed upon as part of their plea agreement. The State did not argue any of the statutory aggravating factors.

In his argument, defense counsel pointed to a number of mitigating factors. Counsel noted defendant's mental impairment, asserting that, according to Eckert's psychological evaluation, defendant "functions at the emotional and mental maturity of an 11-year-old." According to counsel, defendant was not a predator in his relationship with D.R. Rather, because defendant himself was essentially a child, he and D.R. were, in effect, "two young children" in a boyfriend and girlfriend relationship.

Counsel also noted that, according to the record, defendant was not the one who initiated the relationship. Counsel stated: "[D.R.] asked her friend *** to hook them up. Her terminology. And so [the friend] contacted [defendant] and asked him if he would go out with her. *** And after some thought in the process he said he would."

Counsel argued, in addition, that there were mitigating circumstances in defendant's violation of the order of protection. As previously indicated, defendant violated the order in October 2003, about six months after it was entered, by meeting and talking with D.R. in a public park. According to defense counsel, that meeting took place at the instigation of D.R., who asked a friend to arrange for defendant to meet D.R.

In sentencing defendant, the circuit court acknowledged defendant's "unique mental limitations" but noted that, under the statutory offense to which defendant pleaded guilty, a term of imprisonment was required. The court observed that services were available in prison for persons such as defendant with mental limitations. However, in the court's view, these services were "woefully inadequate to deal with the problems this defendant has." The court stated: "As a result of this court's belief that the Department of Corrections will not provide the defendant with the

services that he needs adequately, this court must impose a sentence which will protect the public from further acts by this defendant."

The court commented further on defendant's mental impairment and its impact on his sentencing decision:

"His mental illness is somewhat of a double-edged sword. On one hand, it instills a great deal of sympathy and compassion, as [defense counsel] stated in his beginning remarks. And the system for which we work does not afford those types of individuals a great deal of consideration. But it also instills a great deal of fear in the community because, as demonstrated by this particular defendant, [despite] insistence by his parents, insistence by [D.R.'s] parents, insistence by this court in \*\*\* issuing orders of protection, \*\*\* none of those things were successful at keeping this young man away from this young girl.

[Defendant] had more than ample opportunity throughout the course of this case to demonstrate his ability to control himself. He did not do so. And that should terrify the public."

The court rejected the 6-year sentence recommended by the State and imposed a sentence of 10 years in prison.

In October 2004, defendant filed a motion to reconsider sentence. In his motion, defendant cited a number of factors, including "the Defendant's diminished mental functioning," in arguing that the 10-year sentence was "unduly harsh and severe." Defendant asked the court to "give further consideration to the records and reports contained in the 'Supplementary Pre-Sentence Report' and impose a sentence in accordance with the recommendation of the State's Attorney of six years in the Illinois Department of Corrections."

At the hearing on the motion to reconsider, defense counsel offered arguments similar to those he had advanced at the sentencing hearing. Counsel pointed to defendant's mental impairment, noting that he was "functioning at the emotional maturity of an 11-year-old boy." Defendant's transgression, counsel argued, was that he had sexual contact "with someone who was then a 12-year-old girl as a result of her pursuing him into this relationship." Counsel noted that the statute under which defendant was charged and convicted was intended to deal with sexual predators. However, counsel contended

that, under the facts in the case at bar, defendant could not be seen as a predator. Counsel concluded by stating that "the statute requires a minimum of six [years' imprisonment] in this situation." Counsel argued that, under the circumstances in this case, six years was enough.

The circuit court denied the motion to reconsider sentence. According to the court, defense counsel's arguments were, in essence, no different from the arguments he had previously made.

On appeal, defendant argued that the circuit court abused its discretion by improperly considering defendant's mental retardation as an aggravating factor in sentencing.[2] In support, defendant noted that the Unified Code of Corrections (Corrections Code) (730 ILCS 5/1–1–1 *et seq.* (West 2002)) lists mental retardation as a factor in *mitigation*. 730 ILCS 5/5–5–3.1(a)(13) (West 2002). Defendant sought either a reduction in his sentence or a remand for resentencing before a different judge.

The appellate court concluded that defendant failed to raise this argument in his motion to reconsider sentence, and the issue therefore was not properly preserved for review. The appellate court nevertheless chose to address defendant's claim.[3] No. 4–04–0932 (unpublished order under Supreme Court Rule 23).

The appellate court majority upheld the sentence imposed, holding that the circuit court could properly consider the aggravating aspects of defendant's mental disability. The court stated: "Defendant's failure to control his impulses and conform his behavior does bear upon future dangerousness, and the trial court could

---

[2]Defendant advanced two additional arguments in the appellate court: (1) in its sentencing decision, the trial court erred in relying on assumptions not supported by competent evidence, and (2) the range of punishment provided under the predatory criminal sexual assault statute violated the proportionate penalties clause. Neither of these arguments is before this court in the instant appeal.

[3]Relying on *People v. McCaskill*, 298 Ill. App. 3d 260, 265 (1998), the court asserted that "forfeiture is a limitation on the parties and not upon a reviewing court." No. 4–04–0932 (2006) (unpublished order under Supreme Court Rule 23).

properly consider this as a factor in aggravation." In explaining this decision, the majority nevertheless noted that "this is an unusual case." The court stated:

> "Defendant is borderline mentally retarded and has the mental functioning and maturity of a 10 to 11 year old. Defendant befriended primarily younger children because he apparently felt more comfortable with them than his peers due to his limitations. *** Defendant is not an adult who used his superior knowledge, power, or experiences to exploit the innocence of a child. Defendant himself operates as a child. Defendant engaged in what he perceived to be consensual contact with a physically mature person he perceived, although incorrectly, as a peer." No. 4–04–0932 (unpublished order under Supreme Court Rule 23).

The dissenting justice asserted that defendant's sentence should not have exceeded the statutory minimum of six years. The dissent stated: "The court clearly recognized defendant's cognitive age and his perhaps understandable inability to conform his actions to the law applicable to his chronological age. Yet, the court used that circumstance to aggravate, rather than mitigate, the sentence imposed." No. 4–04–0932 (Appleton, J., dissenting) (unpublished order under Supreme Court Rule 23).

## ANALYSIS

Our initial task is to determine the issue or issues that are properly before us. In his appellant brief to this court, defendant argues that the trial court improperly relied "upon the defendant's mental retardation as a significant factor in aggravation" where the Illinois legislature has "determined that mental retardation is properly considered as a factor in mitigation." Defendant points to section 5–5–3.1(a)(13) of the Corrections Code, which lists mental retardation as a factor in mitigation.[4]

---

[4]The State contends that defendant raised a second issue. According to the State, defendant argued that the trial court erred in imposing a sentence above the statutory minimum "even though defendant is mentally retarded and the People recommended the minimum sentence." The State correctly

-10-

Defendant advanced this same argument in the appellate court below. According to defendant, the trial court erred in characterizing his "impaired mental condition as a factor in aggravation, when the legislature has determined that mental retardation is a factor in mitigation." Accordingly, barring any failure on defendant's part to include this issue in his motion to reconsider sentence, it is this claim–that defendant's mental retardation was improperly considered as an aggravating factor–which is before us. See *People v. Reed*, 177 Ill. 2d 389, 393 (1997). The State argues that this claim was *not* included in defendant's motion to reconsider sentence. According to the State, defendant has forfeited this issue on appeal.

Section 5–8–1(c) of the Corrections Code provides, in pertinent part: "A defendant's challenge to the correctness of a sentence or to any aspect of the sentencing hearing shall be made by a written motion filed within 30 days following the imposition of sentence." 730 ILCS 5/5–8–1(c) (West 2002). In *Reed*, 177 Ill. 2d at 390, this court held that, under section 5–8–1(c), sentencing issues must be raised in a postsentencing motion in order to preserve them for appellate review. In his motion to reconsider sentence, defendant expressly mentioned his "diminished mental functioning" and asked the trial court to "give further consideration to the records and reports contained in the 'Supplementary Pre-Sentence Report' " and to impose a 6-year–rather than a 10-year–sentence. The motion followed the trial court's imposition of a sentence that was four years greater than the statutory minimum recommended by the State "on behalf of [D.R.] and her family."

At the hearing on the motion to reconsider sentence, defense counsel began by arguing that defendant "is not your normal criminal," but rather "is a kind and decent and caring person." Counsel described defendant as a "19-year-old mentally impaired boy

---

notes that this issue was not included in defendant's petition for leave to appeal. In the State's view, this claim is forfeited. In his reply brief, defendant denies making this argument. Rather, defendant expressly agrees that the trial court is never required to impose the statutory minimum, nor is it required to impose the sentence recommended by the State. We agree with defendant that this minimum-sentence claim has not been argued.

whose transgression in this case [was] being receptive to the affections of the 12-year-old girl."

Shortly thereafter, counsel referred to the circuit court's comment at sentencing describing mental impairment as a "double-edged sword." Counsel stated: "At the sentencing hearing the court made an observation which I–it struck me as very accurate. The court said that mental impairment, mental illness, can be a double-edged sword. And I agree with that observation, your Honor." As previously noted, the circuit court explained at sentencing that mental retardation is "double-edged" in that, "[o]n one hand, it instills a great deal of sympathy and compassion *** [b]ut it also instills a great deal of fear in the community." In other words, mental retardation may be seen as both mitigating and aggravating. It may diminish blameworthiness for a crime, even as it indicates that a defendant might be dangerous in the future. See, *e.g.*, *People v. McNeal*, 175 Ill. 2d 335, 370 (1997).

Continuing his argument at the motion hearing, defense counsel argued, in essence, that any aggravating aspects of mental retardation should not apply to defendant. He asserted that it is a person's "heart" or "personality" that drives a person to commit crimes, not his lack of intelligence. He acknowledged that a person who is mentally impaired tends to be a follower and is "vulnerable to being led or misled by somebody with superior intellect." However, he added that mental impairment, in itself, "is no more likely to cause [a] person to be devious than if that person was not impaired." Defendant in the instant case, counsel asserted, was not devious. Counsel observed that, prior to this case, defendant "has never been in trouble in his life by all accounts." In conclusion, counsel noted the 10-year sentence imposed by the court, and stated: "[T]he statute requires a minimum of six in this situation, and I beg you, Your Honor, that's enough."

In his reference to the circuit court's "double-edged sword" comment, defense counsel was noting that mental impairment is sometimes viewed as both mitigating and aggravating. Implicit in this "double-edged sword" reference was the Corrections Code provision listing mental retardation as a mitigating factor (730 ILCS 5/5–5–3.1(a)(13) (West 2002))–a provision which the circuit court was presumed to know. See, *e.g.*, *People v. Duff*, 374 Ill. App. 3d 599, 605 (2007). Moreover, defense counsel, in his argument at the motion hearing, clearly objected to the circuit court's judgment

-12-

regarding the aggravating nature of defendant's mental retardation in this case. After mentioning the "double-edged sword" comment, defense counsel argued that the circuit court erred in imposing a 10-year sentence rather than the statutory minimum of 6 years.[5]

---

[5]Much has been made of the particular wording of defense counsel's reference, at the motion hearing, to the circuit court's previous "double-edged sword" comment. At the motion hearing, which took place on October 29, 2004, counsel stated: "At the sentencing hearing the court made an observation which I–it struck me as very accurate. The court said that mental impairment, mental illness, can be a double-edged sword. And I agree with that observation, your Honor." At the sentencing hearing, which occurred on September 15, 2004, the court stated, in pertinent part: "His mental illness is somewhat of a double-edged sword. On one hand, it instills a great deal of sympathy and compassion *** [b]ut it also instills a great deal of fear in the community ***." The circuit court's comment regarding the "double-edged" nature of mental retardation appears to be directed only at defendant. The court stated: "*His* mental illness is somewhat of a double-edged sword." (Emphasis added.) Thus, it might appear that defense counsel, in his comments at the motion hearing, was adopting the circuit court's judgment regarding the aggravating nature of *defendant's* mental impairment. However, a moment's reflection reveals the absurdity of such a conclusion, which runs directly counter to defense counsel's argument–at this same motion hearing–that defendant's sentence should be reduced. In asserting at the motion hearing that the circuit court's "double-edged sword" comment was "very accurate," counsel obviously was not agreeing with the court that defendant's mental impairment, in particular, was aggravating. Rather, counsel was simply noting the accuracy of the court's comment, taken in a general sense, that mental retardation *may sometimes* be seen as both mitigating and aggravating. (As is explained more fully elsewhere in this opinion, mental retardation–or rather, the future dangerousness which sometimes results from mental retardation–may properly be considered, in an appropriate case, as an aggravating factor in sentencing.) A look at the specific language used by defense counsel at the motion hearing supports the conclusion that he was speaking generally, not specifically. In contrast to the circuit court, which asserted at sentencing: "*His* mental illness is somewhat of a double-edged sword" (emphasis added), counsel, in recounting at the motion hearing the "observation" which he felt was "very accurate," stated: "The court said that mental impairment, mental illness, can be a double-edged sword." There was no mention of defendant

After reviewing the record, we are persuaded that defendant has preserved for review the claim that his mental impairment was improperly considered as an aggravating factor. There are several reasons for requiring that an objection be made first at trial in order to preserve an issue for appeal. One is that this allows the trial court an opportunity to review a defendant's claim of sentencing error and save the delay and expense inherent in appeal if the claim is meritorious. *Reed*, 177 Ill. 2d at 394. A second reason for this requirement is to prevent a litigant from asserting on appeal an objection different from the one he advanced below. Our review of the record leaves us satisfied that these purposes have been met. The trial court had an opportunity to review defendant's claim, and defendant is not asserting in this court a completely different objection from the one he raised below. At the motion hearing, defense counsel expressly referred to the "double-edged" nature of mental retardation, argued that any aggravating aspects of mental retardation should not apply to defendant, and urged the trial court to reduce defendant's sentence. In circumstances such as these, where the trial court clearly had an opportunity to review the same essential claim that was later raised on appeal, this court has held that there was no forfeiture. See *People v. Mohr*, No. 103751 (January 25, 2008); *People v. Coleman*, No. 104386 (February 7, 2008).

We turn to the issue of whether, in view of the legislature's listing of mental retardation as a factor in mitigation, the trial court erred in considering defendant's mental impairment as a factor in aggravation. Defendant answers this question in the affirmative. According to defendant, the trial court's comments at the sentencing hearing showed that it viewed defendant as dangerous because of his mental retardation. It was on this basis, defendant contends, that the trial court determined that defendant should be sentenced to 10 years in prison, rather than the 6 years recommended by the State. Defendant argues that, in reaching this decision, the trial court erred

---

or any other specific individual in this recounted version of the statement. Moreover, where the circuit court asserted that defendant's mental impairment "is" a double-edged sword, counsel stated, by contrast, that mental impairment "can" be a double-edged sword.

in considering defendant's mental impairment as a factor in aggravation.

The State responds that the trial court did not use defendant's mental retardation as an aggravating factor. The State notes that the maximum sentence for a Class X felony is 30 years. According to the State, if the court had viewed defendant's mental impairment as a factor in aggravation, it likely would have imposed a much longer sentence. In the State's view, the actual sentence of 10 years shows that the trial court considered defendant's mental deficiency as a mitigating–not an aggravating–factor.

Section 5–5–3.1(a) of the Corrections Code lists factors in mitigation, which "shall be accorded weight in favor of withholding or minimizing a sentence of imprisonment." 730 ILCS 5/5–5–3.1(a) (West 2002). One of these factors is: "The defendant was mentally retarded as defined in Section 5–1–13 of this Code." 730 ILCS 5/5–5–3.1(a)(13) (West 2002). Section 5–1–13 provides: " 'Mentally retarded and mental retardation' mean sub-average general intellectual functioning generally originating during the developmental period and associated with impairment in adaptive behavior reflected in delayed maturation or reduced learning ability or inadequate social adjustment." 730 ILCS 5/5–1–13 (West 2002). The parties agree that defendant falls within this definition.

Section 5–5–3.2(a) lists factors in aggravation, which "shall be accorded weight in favor of imposing a term of imprisonment or may be considered by the court as reasons to impose a more severe sentence under Section 5–8–1." 730 ILCS 5/5–5–3.2(a) (West 2002). Mental retardation is not among the 20 aggravating factors[6] listed in section 5–5–3.2(a), none of which, as noted, were argued by the State at sentencing.

Given that the legislature chose to include mental retardation as a mitigating factor in section 5–5–3.1(a) but did not choose to include it as an aggravating factor in section 5–5–3.2(a), we consider it beyond dispute that the use of mental retardation as an aggravating

---

[6]Section 5–5–3.2(a) now contains two additional factors, neither of which is applicable to the case at bar. See 730 ILCS 5/5–5–3.2(a)(20), (a)(21) (West 2006).

factor in sentencing is improper. Some clarification of terms is in order.

There are two basic ways in which it might be said that mental retardation is used as an aggravating factor in sentencing. First, the trial court might conclude that the sentence of a mentally retarded defendant should be increased purely because he is mentally retarded. This would, in essence, be discriminatory–a consideration of mental retardation as a *per se* aggravating factor–which is prohibited under the statute.

Alternatively, a trial court might conclude, from the evidence, that a defendant's mental retardation rendered him dangerous to the community, and for this reason decided to increase the defendant's prison sentence. If, for example, the evidence established that a defendant had diminished impulse control as a result of his mental deficiency, and if that lowered impulse control rendered him a threat to the community, a trial court might conclude that, because of the defendant's future dangerousness resulting from his lack of control, the defendant should be given a greater prison sentence in the interest of protecting the public. See *People v. McNeal*, 175 Ill. 2d 335, 370 367-71 (1997). However, where mental retardation indicates future dangerousness, it is not the mental retardation that is being used as the aggravating factor. Rather, it is the future dangerousness that *results* from the mental retardation that is the aggravator. In our view, there is nothing improper in considering the effects of mental retardation in this way, so long as the evidence supports the conclusion that the defendant poses a future danger.

In the case at bar, defendant's claim is not that the trial court engaged in the purely discriminatory use of mental retardation as an aggravating factor. Instead, defendant argues that the trial court improperly perceived defendant as dangerous, as a result of his mental retardation, and in that sense used defendant's mental deficiency as an aggravating factor in determining defendant's ultimate sentence.

As noted, this sort of consideration of mental retardation in sentencing is not improper, so long as the evidence supports the trial court's conclusion that the defendant is dangerous. Defendant argues that there was no basis in the evidence for the trial court's conclusion that defendant posed a future danger to the community. In this sense,

-16-

then, defendant argues that the trial court improperly considered his mental retardation as a factor in aggravation.

A sentence based on improper factors will not be affirmed unless the reviewing court can determine from the record that the weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence. *People v. Conover*, 84 Ill. 2d 400, 405 (1981), cited in *People v. Martin*, 119 Ill. 2d 453, 458 (1988); see also *People v. Saldivar*, 113 Ill. 2d 256, 272 (1986) (reducing sentence, where circuit court erred in imposing sentence in excess of statutory minimum based on improper aggravating factor).

In the case at bar, the circuit court clearly indicated at sentencing that, in the court's view, defendant posed a serious future threat to the community as a result of his mental impairment. The court asserted, for example, that defendant was "desperately" in need of "services" to deal with his "problems," but that any such services he might receive in prison would be "woefully inadequate to deal with the problems this defendant has." The court stated: "As a result of this court's belief that the Department of Corrections will not provide the defendant with the services that he needs adequately, this court must impose a sentence which will protect the public from further acts by this defendant." A short time later, the court stated: "I can't imagine that a community, our communities in particular, would condone the free movement of an individual such as [defendant] with all his problems, whether they be inherited or otherwise, into the community." In addition, as previously noted, the court referred to defendant's mental impairment as a "double-edged sword" that was both mitigating and aggravating. According to the court, while defendant's mental retardation "instills a great deal of sympathy and compassion *** it also instills a great deal of fear in the community." The court pointed to efforts by defendant's parents and D.R.'s parents to keep defendant and D.R. apart, as well as to the order of protection entered by the court. The court stated: "[Defendant] had more than ample opportunity throughout the course of this case to demonstrate his ability to control himself. He did not do so. And that should terrify the public."

As noted, where a defendant poses a future threat as a result of his mental retardation, there is nothing improper in considering this

-17-

future dangerousness as an aggravating factor in sentencing, so long as the record supports the conclusion that the defendant poses a future danger. The difficulty here is that the record in this case does not support the circuit court's conclusion that the public should be "terrif[ied]" of defendant.

For example, notwithstanding that defendant was charged with the offense of predatory criminal sexual assault, and notwithstanding that he pleaded guilty to this offense, there is virtually nothing in the record to indicate that defendant was, as the circuit court characterized him, a "sexual predator *** who commits crimes against young people." Prior to this case, defendant's history–as shown in the presentence investigation report–included only traffic violations such as speeding, disregarding a stop sign and violation of the seat belt provisions of the Illinois Vehicle Code. There was nothing in his prior history that even remotely resembled a violent crime or an offense of a sexual nature. In the case at bar, the record shows that defendant did not initiate the relationship with D.R. It was D.R. who pursued defendant. Moreover, defendant socialized with students who were D.R.'s age–not in order to prey on them–but because they were, in essence, his peers in terms of emotional maturity. As defendant's high school principal wrote in his letter in defendant's support: "[I]t seemed that [defendant] felt more comfortable talking with these students and spending time with them. Because of [defendant's] social, emotional, and maturity levels, he was spending time with students who were very much like him." The principal noted, in his letter, that younger students who spent time with defendant appeared to be impressed with the fact that he was older and had a car. However, there is nothing in the letter to indicate that defendant consciously tried to impress these students with his superior age or his car, or that he was even aware that the students were so impressed.

In addition, the circumstances leading to defendant's violation of the order of protection fall far short of presenting or even suggesting a picture of a "terrify[ing]" individual. The meeting between defendant and D.R. took place in a public park in October 2003, some six months after the order was entered. According to defense counsel–who made this assertion, without objection, at the sentencing

hearing–the meeting occurred at the instigation of D.R., who asked a friend to arrange for defendant to meet D.R.

Finally, the 6-year sentence recommended by the State, "on behalf of [D.R.] and her family," undermines the conclusion that defendant posed so serious a future threat that a 10-year sentence–4 years longer than the recommended statutory minimum–was required to protect the public.

Where a court imposes a sentence based on a conclusion that the defendant's mental retardation renders him a future danger, and where the record does not support such a conclusion, the court has improperly relied on mental retardation as an aggravating factor in sentencing. Here, the circuit court improperly concluded that because of his mental impairment, defendant was an individual of whom the public should be "terrif[ied]," and the court imposed a sentence four years longer than the recommended statutory minimum. In this instance, the circuit court improperly relied on defendant's mental retardation as an aggravating factor in sentencing.

We further conclude that the weight placed on this improper factor was significant enough that it led to a greater sentence. See *Conover*, 84 Ill. 2d at 405, cited in *Martin*, 119 Ill. 2d at 458. Defendant's alleged future dangerousness was, in essence, the aggravating factor relied upon by the court in fixing the sentence. See *Saldivar*, 113 Ill. 2d at 272. In its comments at sentencing, the court referred to defendant's "limitations" and "problems" and asserted that, as a result, the court needed to impose a sentence that would "protect the public from further acts by this defendant." The sentence imposed was 10 years–4 years greater than the recommended statutory minimum. The State, at sentencing, argued none of the statutory factors in aggravation. See 730 ILCS 5/5–5–3.2(a) (West 2002).

Under these circumstances, the 10-year sentence imposed by the circuit court cannot be affirmed. Accordingly, the judgment of the appellate court is reversed, and defendant's sentence is vacated. We remand the cause to the circuit court of Woodford County for resentencing. In view of the comments made by the circuit court at sentencing, we conclude that, in order to remove any suggestion of unfairness, this case should be assigned to a different judge on remand. See *People v. Dameron*, 196 Ill. 2d 156, 179 (2001).

CONCLUSION

For the reasons stated, we reverse the judgment of the appellate court. Defendant's sentence is vacated, and the cause is remanded to the circuit court of Woodford County for resentencing to be conducted by a different judge.

*Appellate court judgment reversed;*
*sentence vacated;*
*cause remanded with directions.*

CHIEF JUSTICE THOMAS, dissenting:

I disagree both with the majority's forfeiture analysis and with its conclusion that the trial court improperly used defendant's mental retardation as an aggravating factor in sentencing defendant. Accordingly, I would affirm the appellate court's judgment.

FORFEITURE

Resolution of this appeal should be relatively straightforward. I agree with the appellate court's determination that defendant forfeited his argument that the trial court improperly used a statutory mitigating factor–mental retardation–to aggravate defendant's sentence. Indeed, the point hardly seems debatable. As the majority notes, in order to preserve a sentencing issue for appellate review, the issue must be raised in a written postsentencing motion. 730 ILCS 5/5–8–1(c) (West 2006); *People v. Reed*, 177 Ill. 2d 389, 390 (1997). Here, defendant raised a single issue in his motion to reconsider the sentence:

> "Considering the facts and circumstances of this case, the history and character of the Defendant, the Defendant's lack of any prior criminal record, and the Defendant's mental functioning, the sentence of ten years in the Illinois Department of Corrections is unduly harsh and severe."

Defendant did *not* argue that the trial court improperly treated mental retardation–a statutory mitigating factor–as aggravating. Accordingly, that claim is forfeited.

-20-

Forfeiture in criminal cases is governed by Rule 615, which provides that, "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the reviewing court" (134 Ill. 2d R. 615). In *People v. Piatkowski*, 225 Ill. 2d 551 (2007), we explained that, under Rule 615, a defendant may obtain relief on a forfeited issue when either of two situations is present: (1) "a clear or obvious error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "a clear or obvious error occurs and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Piatkowski*, 225 Ill. 2d at 565. Once a forfeiture occurs, and plain-error review is triggered, the burden is on the defendant to demonstrate that one of these two prongs has been satisfied. See *People v. Thurow*, 203 Ill. 2d 352, 363 (2003). Here, defendant elected not to try to meet that burden. In response to the State's argument that defendant's argument was forfeited and plain error did not occur, defendant persisted in arguing that the issue was not forfeited. He did not argue that, assuming that the issue was forfeited, plain error occurred. Accordingly, because defendant's issue was forfeited and because defendant elected not to try to meet his burden of establishing plain error, the appellate court's judgment must be affirmed.

The appellate court, after finding a forfeiture, erroneously reached defendant's issue on the basis that "forfeiture is a limitation on the parties, and not upon a reviewing court." No. 4–04–0932 (unpublished order under Supreme Court Rule 23). The statement that "forfeiture is a limitation on the parties and not on the court" is not intended to be a catchall that allows reviewing courts to consider forfeited issues at will. Rather, this oft-misused and misunderstood statement has its genesis in *Hux v. Raben*, 38 Ill. 2d 223 (1967), in which a party argued that the appellate court lacked *jurisdiction* to decide the appeal on a ground that had not been raised before. This court rejected this argument, holding that Rule 341(e)(7)'s statement that issues not raised in the briefs are waived "states an admonition to the parties, not a limitation upon the *jurisdiction* of the reviewing court." (Emphasis added.) *Hux*, 38 Ill. 2d at 224. Reviewing courts in

this state frequently drop the word "jurisdiction" and use this statement as a reason to excuse a party's forfeiture. However, as *Hux* itself recognized, forfeiture in criminal cases is governed by Rule 615's plain-error rule. *Hux*, 38 Ill. 2d at 224. When a court uses the phrase "forfeiture is a limitation on the parties and not on the court" as an independent basis for excusing a defendant's forfeiture, it improperly relieves the defendant of his burden of establishing plain error.

The majority refuses to recognize defendant's obvious forfeiture and instead reasons as follows. Quickly dispensing with the motion itself, the majority merely states that the motion mentioned defendant's "diminished mental functioning," asked the court to consider the record, and asked for the sentence to be reduced to six years. Slip op. at 11. The majority then moves on to the defendant's oral argument at the hearing on the motion to reconsider the sentence. One would think that the majority would want nothing to do with this argument since defendant at no point argued that the trial court had improperly treated a statutory mitigating factor as aggravating. Indeed, the only time defense counsel even came close to addressing this point was when he remarked:

> "At the sentencing hearing the court made an observation which I–it struck me as very accurate. The court said that mental impairment, mental illness, can be a double-edged sword. And I agree with that observation, your honor."

The importance of this comment by defense counsel cannot be overstated because the trial court's "double-edged sword" comment is the very crux of defendant's argument as to why he deserves a new sentencing hearing. Not only is the majority not troubled in the least by defendant's shifting position on this issue, the majority holds that this comment is what allows us to reach the issue on appeal. The majority argues that "defendant is not asserting in this court a completely different argument from the one he raised below" because "[a]t the motion hearing, defense counsel expressly referred to the 'double-edged' nature of mental retardation, argued that any aggravating aspects of mental retardation should not apply to defendant, and urged the trial court to reduce defendant's sentence." Slip op. at 14. The majority concludes by finding support for its analysis in two recent decisions of this court: "In circumstances such

-22-

as these, where the trial court clearly had an opportunity to review the same essential claim that was later raised on appeal, this court has held that there was no forfeiture. See *People v. Mohr*, No. 103751 (January 25, 2008); *People v. Coleman*, No. 104386 (February 7, 2008)." Slip op. at 14.[7]

Let us now consider the errors in the majority's analysis. First, the majority barely considers the motion defendant filed, which raised one argument: that the entirety of defendant's mitigating evidence should have led the court to impose a lesser sentence. Defendant did *not* argue that the court erred in treating a statutory mitigating factor–mental retardation–as aggravating. The majority seems satisfied that the motion did raise this issue because the motion mentioned defendant's "diminished mental functioning." Slip op. at 11.

The majority appears to be adopting an unprecedented approach to forfeiture analysis: the argument does not have to be the same, it merely has to relate to the same subject. The majority confirms this new analysis when it states that it will review defendant's issue because "defendant is not asserting in this court a *completely* different objection from the one he raised below." (Emphasis added.) Slip op. at 14. Thus, since the motion mentioned "diminished mental functioning," this preserves for review any argument that has anything to do with mental retardation. Is this really how forfeiture analysis will be conducted in the future? If a motion to reconsider mentions "drugs" or "weapons" will that preserve for review all arguments that in any way mention drugs or weapons? Would an argument that the trial court abused its discretion in its weighing of the mitigating and aggravating factors preserve for review an argument that defense counsel was ineffective for failing to introduce certain mitigating evidence? It would under the logic the majority uses above. The motion to reconsider used the term "diminished mental functioning" only in the context of arguing that the entirety of

---

[7]The majority's reasons for finding that the issue is not forfeited are not those advanced by defendant. It is not clear why the majority is making arguments for defendant instead of addressing the arguments defendant actually made.

defendant's mitigating evidence should have led the court to impose a lesser sentence.

Moreover, since when is the relevant inquiry whether the defendant is raising a *completely* different objection from the one he raised below?[8] Apparently, the majority would find preserved for review an argument that was 99% different from the one raised in the trial court. This makes no sense because, as the majority acknowledges, the reason we require issues to be raised first in a postsentencing motion is to give the trial court the opportunity to address the claim first and to possibly save the expense and delay of an appeal if the argument is meritorious. *Reed*, 177 Ill. 2d at 394. Further, "[s]uch a motion also focuses the attention of the trial court upon a defendant's alleged errors and gives the appellate court the benefit of the trial court's reasoned judgment on those issues." *Reed*, 177 Ill. 2d at 394. Obviously, these policies cannot be vindicated unless the issue presented on appeal is the same as the one presented in the trial court. The majority seems not in the least concerned at the extent to which its analysis undermines *Reed* and, indeed, states that it believes that *Reed*'s purposes have been satisfied here. Slip op. at 14. If that is true, perhaps the majority could cite to the portion of the record in which we are given the benefit of the trial court's reasoned judgment on whether it had improperly treated a statutory mitigating factor as aggravating.[9]

---

[8]It is worth noting that, even if the majority's position on forfeiture were correct, that would still not help the majority here. An argument that the trial court improperly treated a statutory mitigating factor as aggravating is, in fact, completely different from an argument that the entirety of defendant's mitigating evidence should have led to a lesser sentence. The first contention raises an error of law; the second attacks the manner in which the trial court weighed the evidence in arriving at its sentence.

[9]If defense counsel did indeed make this argument, it was far too oblique for the trial court to discern it. At the close of defense counsel's argument, the trial court commented that defense counsel had just rehashed points that he had already made and did not point out anything that the court had overlooked or misapprehended. This comment obviously would make no sense if the trial court had understood defense counsel to be arguing that the trial court had improperly treated a statutory mitigating factor as

-24-

The majority denies that it is implementing a new forfeiture analysis by merely requiring the issue raised in the postsentencing motion to contain some of the same words as the issue raised on appeal. The majority cites to *Mohr* and *Coleman*, and states that these cases stand for the proposition that "where the trial court clearly had an opportunity to review the same essential claim that was later raised on appeal, this court has held that there was no forfeiture." Slip op. at 14. The majority, however, includes no discussion of *Mohr* and *Coleman*. This is no doubt because neither case offers the slightest support for the majority's position.

In *Coleman*, the defendant argued both in the trial court and in the reviewing courts that his motion to suppress certain audio recordings should have been granted. The State argued forfeiture on the basis that defendant did not include in his motion the portion of his argument that this court should overturn certain appellate court precedent. This court rejected the State's argument, noting that "the fact that [defendant] did not ask the trial court to ignore appellate court precedent is unsurprising: the decisions of our appellate court are binding on all circuit courts." *Coleman*, slip op. at 5-6. Thus, *Coleman* stands for nothing more than the unremarkable and self-evident proposition that, before a party may ask a court to overturn precedent, it does not need to first make that request of a court that has no authority to do so.

In *Mohr*, the issue was not whether the issue raised in the posttrial motion needed to be the same as the issue raised on appeal but whether the issue objected to at trial needed to be the same as the one raised in the posttrial motion. The court split 6-1 on this issue. The majority held that, as long as the defendant objected to a particular instruction both at trial and in the posttrial motion, the reason for the defendant's objections did not have to be the same: "The State essentially asks us to tailor the forfeiture rule, requiring the defendant to assert the same argument at trial and in his posttrial motion as to why an instruction was improper. We decline to do so." *Mohr*, slip op. at 9; but see *Coleman*, slip op. at 5 ("to preserve an issue for appellate review, a defendant must both object at trial and present *the*

aggravating.

*same issue* in a written posttrial motion" (emphasis added)). The dissent would have found the claim forfeited and subject to plain-error review. The dissent argued that the State was not asking this court to tailor the forfeiture rule but to apply the forfeiture rule. According to the dissent, the majority's ruling eroded "the bedrock requirements that both a trial and posttrial objection are required to preserve a trial error, and that a specific objection at trial waives all other unspecified grounds that might later be raised with respect to a jury instruction." *Mohr*, slip op. at 18 (Thomas, C.J., dissenting). Whatever one thinks of the *Mohr* dispute, at least in that case the issue was raised in the posttrial motion so the trial court *was* given a chance to review the issue before it was raised on appeal. In that case, we specifically noted that the issue defendant raised on appeal, although different from his trial court objection on the issue, was the same as that argued in his posttrial motion. *Mohr*, slip op. at 9.

Thus, the *only* support the majority can find for the proposition that the court can reach an issue on appeal as long as it is not "completely different" from the one raised in the postsentencing motion is one case in which the issue raised in the posttrial motion was *identical* to the one raised on appeal and another in which this court said that, before a litigant may ask a reviewing court to overturn precedent, he is not required to first make the request of a lower court that has no authority to do so. In other words, there is *no* precedent supporting the majority decision.

As noted above, the majority spends very little time (one sentence) on defendant's motion to reconsider and spends the lion's share of its forfeiture analysis attempting to show that the issue was raised at the hearing on the motion to reconsider. It should go without saying that, as the hearing's purpose is to allow counsel to argue why *the motion* should be granted, it is not the place for raising entirely new issues. The majority fails to cite any authority for the proposition that a party can preserve an issue by raising it not in a motion to reconsider the sentence but at a hearing on the motion. Be that as it may, we need not dwell on that point because defendant did not raise the argument at the hearing either. The thrust of defense counsel's argument was that the 12-year-old girl, not defendant, was the sexual predator. Defense counsel also argued that defendant is a good person and that the court should focus on defendant's heart. Defense counsel

said not one word about aggravating factors[10] and made no mention of the statute that defendant claims on appeal that the trial court violated. The closest defense counsel came to saying anything at all about the subject was when he stated that the trial court's description of mental retardation as a double-edged sword was "*very accurate*" and that he *agreed* with it.

The majority finds that this argument at the hearing preserved defendant's right to claim on appeal that the trial court's characterization of mental retardation as a double-edged sword was *erroneous as a matter of law* and that he *disagreed* with it. Here is how the majority comes to that conclusion. The majority acknowledges that, when the trial court referred to mental retardation as a double-edged sword, he was referring specifically to defendant's mental retardation ("[h]is mental illness is somewhat of a double-edged sword"). However, even though defense counsel referenced that specific statement of the trial court, what defense counsel was saying was that *in general* mental retardation may be both aggravating and mitigating, but that was not true of defendant's mental retardation. The majority claims that this must have been what defense counsel was saying because an acknowledgment that defendant's mental retardation was both aggravating and mitigating would have been contrary to defense counsel's argument that defendant's sentence should be reduced. It is not clear from where the majority derives the notion that a defendant may not argue that a sentence should be reduced if the defendant acknowledges that there is anything aggravating in the evidence. The argument defendant raised in his motion to reconsider the sentence was that the *entirety* of the mitigating evidence should have led the court to impose a lesser sentence. That argument is not undermined by a concession that defendant's mental illness is a double-edged sword. Moreover, the majority's characterization of defense counsel's argument is pure invention. Nowhere in that argument did defense counsel argue that,

---

[10]No variation of the word "aggravate" appears anywhere in defense counsel's argument. Perhaps this is why the majority is forced to claim that "defense counsel argued, *in essence*, that any aggravating aspects of mental retardation should not apply to defendant." (Emphasis added.) Slip op. at 12.

in general, mental retardation can be both aggravating and mitigating but in this case there are no aggravating aspects of defendant's mental retardation. Rather, defense counsel specifically stated that "he (defendant) is subject to being influenced and led down the wrong path because of his intellect." Because of this, defense counsel argued that the court should focus more on what is in defendant's heart. Defense counsel's argument was not that defendant's mental retardation was not a double-edged sword but that defendant presented sufficient mitigating evidence to entitle him to a minimum sentence.

The majority apparently does not realize that, if its characterization of defense counsel's argument is accepted, that would prove defendant's forfeiture. Defendant's argument before this court is that mental retardation may not be used as a factor in aggravation. It is not defendant's argument that it may be used in aggravation, just not in this case. As argued by defendant in his brief:

> "Much like the United States Supreme Court, the Illinois legislature has recognized that mental retardation is only a factor in mitigation. The Illinois Criminal Code contains a list of 13 grounds which 'shall be accorded weight in favor of withholding or minimizing a sentence of imprisonment.' The last item in section 5/5–5–3.1(a)(13) is that '[t]he defendant was mentally retarded as defined in [730 ILCS ... .' [*sic*]' 730 ILCS 5/5–5–3.1(a)(13) (West 2002). Section 5/5–1–13 defines 'mentally retarded' as 'sub-average general intellectual functioning generally originating during the developmental period and associated with impairment in adaptive behavior reflected in delayed maturation or reduced learning ability or inadequate social adjustment.' 730 ILCS 5/5–1–13 (West 2002). Significantly, mental retardation is not listed among the 21 statutory factors in aggravation. 730 ILCS 5/5–5–3.2(a)(1–21) (West 2002)." Defendant's brief at 35.

Defendant then references *People v. Kuntu*, 196 Ill. 2d 105 (2001), in which this court held that the State was not entitled to argue that the statutory mitigating factor of lack of criminal history may be used in aggravation. This court held that the sentencer did not have to place any weight on that factor, but that it could not interfere with the

legislative scheme by converting it to a factor that weighs in favor of the death penalty. *Kuntu*, 196 Ill. 2d at 142.

Clearly, then, defendant's argument before this court is that a court may not as *a matter of law* treat a statutory mitigating factor as aggravating. If, as the majority insists, the most sensible interpretation of counsel's argument at the hearing on the motion to reconsider is that trial courts may *in general* treat mental retardation as aggravating, then defendant has unquestionably forfeited his right to argue on appeal that trial courts are categorically prohibited from doing so. Having taken its best shot at finding the argument not forfeited, even going so far as to advance an argument that defendant never made, the best the majority can do is to conclusively prove the forfeiture.

The most regrettable thing about the majority's analysis is that it undermines plain-error review and guarantees that arbitrariness will rule forfeiture analysis. In this opinion, the court had the chance to ensure that forfeiture analysis will be both fair and straightforward. A court should look to see if the specific argument was made below at the proper time. If it was, address the issue. If not, hold the defendant to his burden of establishing plain error. All defendants should be held to the same standard. Instead, the majority gives the courts free rein to consider whether defendant is raising an issue on appeal that is "*completely* different" from the one asserted below. If the issue was not raised in the motion where it should have been, courts may consider whether the defendant *essentially* made that argument at the *hearing* on the motion. Moreover, this court no longer appears concerned, as it was in *Reed*, that the trial court should be given the chance to address any claim of error first and that the reviewing court is entitled to have the trial court's reasoned judgment on issues raised in postsentencing motions. Again, remember what the majority holds today: a motion that asserts that the entirety of defendant's mitigation evidence should have led to a shorter sentence preserves for appeal the issue that the trial court improperly treated a statutory mitigating factor as aggravating. There can be no doubt that courts will continue to find forfeiture in some cases where a defendant's arguments are as disparate as these. There can also be no doubt that other courts will take today's opinion as a license to find virtually any argument preserved for appeal, and courts will be able

to avoid plain-error review whenever they want. We have sent a strong signal today that our forfeiture rules are not really rules at all, and that they may be disregarded whenever a reviewing court feels like it. If this court shows such a disregard for our own rules and the cases interpreting them, we will be in no position to complain when the appellate court does the same thing.

## MERITS

Once the majority improperly reaches defendant's issue, it continues to make errors and to expand the issues on appeal. The first problem in this section of the opinion is the majority's failure to set forth a standard of review. This may be because what the majority opinion ultimately does is to confuse a discretionary weighing of sentencing factors with a question of law. Defendant frames his issue in terms of trial court discretion. According to defendant, a trial court abuses its discretion if it treats mental retardation as aggravating. The majority never explains if it agrees with defendant that abuse of discretion review is appropriate. Rather, the majority makes vague statements about "error," leaving the reader to wonder what standard the majority is applying. If the majority is implicitly rejecting abuse of discretion review in favor of *de novo* review, that would seem appropriate for the issue as defendant frames it. If the trial court does not have discretion to treat statutory mitigating factors as aggravating, then it would seem that doing so would be an error of law, triggering *de novo* review. The problem becomes more complex, however, when the majority does not identify an error of law. The majority explicitly endorses the view that the effects of mental retardation can be aggravating as a component of future dangerousness. Slip op. at 16. What the majority ultimately concludes is simply that there was insufficient evidence of future dangerousness. Slip op. at 17-19. What the majority is really doing here is *not* identifying an error of law, but concluding that the trial court should have weighed the sentencing factors differently. If this is the majority's analysis, then it should be proceeding under abuse of discretion review (after explaining why it is deciding an issue other than the one defendant raised). See *People v. Streit*, 142 Ill. 2d 13, 19 (1991). It is incumbent on the majority to set forth the appropriate standard of review, the case law supporting

its decision, and whether it is reversing based on an error of law or an improper weighing of sentencing factors. Because it is not clear to me precisely what the majority is holding, I will demonstrate both that no error of law occurred and that there was no abuse of discretion in the manner in which the court weighed the sentencing factors.

At the outset, it is important to note that the majority explicitly endorses the trial court's "double-edged sword" comment. The majority states that it recognizes that, in some cases, the effects of mental retardation can be viewed as aggravating. Slip op. at 16. If the defendant's mental retardation has resulted in the defendant's lack of ability to control himself, the trial court may consider this factor in the interest of protecting the public. Slip op. at 16. In other words, the trial court *can* properly consider future dangerousness as aggravating, even if mental retardation is a factor in causing the defendant's future dangerousness.[11] The majority then concludes, based on its reweighing of the evidence, that there was no evidence to support the trial court's future-dangerousness determination. Slip op. at 17-19.

In *People v. Ward*, 113 Ill. 2d 516 (1986), a case in which the defendant argued that the trial court improperly considered his protestation of innocence as an aggravating factor at sentencing, this court explained that:

> "Before reversing a sentence imposed by the trial court it must be clearly evident that the sentence was improperly imposed. [Citations.] In making the determination, the reviewing court should not focus on a few words or statements of the trial court. Rather, the determination of whether or not the sentence was improper must be made by considering the entire record as a whole." *Ward*, 113 Ill. 2d at 526-27.

The majority does not set forth the trial court's comments in their entirety, and instead merely culls from those comments isolated remarks that it believes support its result. The majority does not even consider or set forth the comments that the State relies upon in

---

[11]This conclusion is supported by our case law. See, *e.g.*, *People v. Madej*, 177 Ill. 2d 116, 139 (1997); *People v. Tenner*, 175 Ill. 2d 372, 382 (1997); *People v. Cox*, 82 Ill. 2d 268, 277-79 (1980).

arguing that the trial court did *not* consider defendant's mental retardation to be an aggravating factor. I believe that when the trial court's comments are considered in their entirety, the most reasonable inference is that the trial court did view defendant's mental retardation as mitigating and gave defendant a shorter sentence than he would have had defendant not been mentally retarded. However, the trial court found that a longer sentence than that recommended by the parties was necessary for the protection of the public. Because I believe that the majority opinion does not give the reader a fair representation of the trial court's reasoning, I will set forth the trial court's sentencing comments in their entirety:

> "Court has considered the factual basis given at the time of the original plea, the contents of the Presentence Investigation and the Addendum thereto, and each and every statutory factor in aggravation and mitigation.
>
> This case cannot be viewed, I suppose, in a normal sense of a criminal conducting or committing a crime against society or against another individual because of the unique mental limitations of the defendant. But other than pleading the way this defendant pled, in other words, guilty but mentally ill, the law does not give this court discretion in determining whether the defendant should be returned to society or incarcerated.
>
> For there is no doubt, I'm sure, that everyone in this room and anyone who would be asked to provide a collective judgment within the community would agree that a 19 or 20-year-old sexual predator of young girls should deserve a substantial sentence in prison. That may or may not be true for a 20-year-old sexual predator with an 11-year old mentality.
>
> But, unfortunately, due to the–I guess I would argue is the past transgressions of those who serve in positions similar to mine, the legislature has found fit to mandate minimum prison sentences on offenses–for offenses such as this. As a result, this court is prohibited from imposing a sentence which would provide for the services that the defendant desperately needs, given his unique limitations. The legislature has required that the defendant be placed in prison.

-32-

And although there are services provided in prison, they are woefully inadequate to deal with the problems this defendant has. And the result, as Mr. Bernardi has indicated, this case demonstrates at least one, if not more than, the complete, utter failure of the criminal justice system to deal with problems such as this.

As a result of this court's belief that the Department of Corrections will not provide the defendant with the services that he needs adequately, this court must impose a sentence which will protect the public from further acts by this defendant. It is with no pleasure and it's with a great deal of sympathy for the family of this defendant, because for the life of me I can't imagine what it would be like sitting in their chairs this afternoon.

I feel compelled, I suppose, it wasn't part of my notes, to address a portion of the argument that was made by Mr. Bernardi concerning the collective judgment of the community. And we have heard from numerous members of the community here, relatives and friends and coworkers and teachers and social workers, all of which who are acquainted one way or another with the defendant. But we have not heard from those unnamed and unfamiliar citizens of our community who will only know Blake Heider as a sexual predator, who will only know this man as a person who commits crimes against young people. And I suppose I beg to differ with Mr. Bernardi in that respect, because I can't imagine that a community, our communities in particular, would condone the free movement of an individual such as Blake with all his problems, whether they be inherited or otherwise, into the community.

His mental illness is somewhat of a double-edged sword. On one hand, it instills a great deal of sympathy and compassion, as Mr. Bernardi stated in his beginning remarks. And the system for which we work does not afford those types of individuals a great deal of consideration. But it also instills a great deal of fear in the community because, as demonstrated by this particular defendant, insistence by his parents, insistence by [D.R.'s] parents, insistence by this court

-33-

in ordering–issuing orders of protection, did not–and I am sure with each of those instances an explanation was–accompanied those discussions of the illegal nature of these contacts, but none of those things were successful at keeping this young man away from this young girl.

Mr. Heider had more than ample opportunity throughout the course of this case to demonstrate his ability to control himself. He did not do so. And that should terrify the public.

Sentence of the court is ten years Department of Corrections.”

When the trial court's comments are viewed in their entirety, it is clear to me that the trial court viewed defendant's mental retardation as mitigating. The court stated that ordinarily a 19- or 20-year-old sexual predator of young girls should deserve a substantial sentence in prison, but that this may or may not be true for a 20-year-old sexual predator with an 11-year-old mentality. The court further explained that, because of the “unique mental limitations” of this defendant, this case could not be viewed in a “normal sense of a criminal conducting a crime against society or against another individual.” The court found that defendant's mental limitations instilled “a great deal of sympathy and compassion.” Nevertheless, the court found that a sentence greater than that recommended by the parties was necessary for the protection of the public. The court spelled out its reasons for this belief: “insistence by [defendant's] parents, insistence by [D.R.'s] parents, insistence by [the trial court] in ordering–issuing orders of protection *** none of those things were successful at keeping this young man away from this girl.” Moreover, defendant had been repeatedly warned of the illegal nature of his actions. By making the “double-edged sword” comment–the comment that defense counsel would later describe as “very accurate”–the court recognized that defendant's mental retardation was a factor in his inability to stay away from the victim. But the court still believed that protection of the public required a 10-year sentence.

The primary concern expressed by the trial court was protection of the public from a defendant who, despite repeated warnings and an order of protection, could not keep away from a 12-year-old girl whom he had sexually abused. As the State points out, an essential but unstated component of defendant's claim that the trial court considered his mental retardation as an aggravating factor is a

demonstration that, were it not for his mental retardation, the trial court would have imposed a sentence of less than 10 years. Not surprisingly, the majority simply ignores this argument, because it would be impossible to conclude from the trial court's remarks that, had defendant simply been a 19-year-old with no mental limitations who pleaded guilty to predatory criminal sexual assault against a 12-year-old girl, it would have given him a sentence of less than 10 years.[12] This is confirmed by the trial court's remarks that the collective judgment of the community is that a 19- or 20-year-old sexual predator of young girls is deserving of a substantial prison sentence, but that this may or not be true of a 19-year-old with an 11-year-old mentality.

Clearly, no error of law occurred. The majority agrees that future dangerousness is a legitimate factor in aggravation, even if mental retardation is a component of a defendant's future dangerousness, and there is no evidence that the trial court considered anything aggravating about defendant's mental retardation except as it related to future dangerousness.

I also do not find an abuse of discretion in the manner in which the trial court weighed the sentencing factors. It is well settled that the trial court is the proper forum to determine a sentence and that the trial court's sentencing decision is entitled to great deference and weight. *People v. Latona*, 184 Ill. 2d 260, 272 (1998). When a reviewing court examines the propriety of a sentence, it must proceed with great caution, and it may not substitute its judgment for that of the trial court simply because it would have weighed the factors differently. *Streit*, 142 Ill. 2d at 19. When mitigating evidence is before the court, it is presumed that the trial court considered it, absent some indication to the contrary other than the sentence itself.

---

[12]At oral argument, defense counsel did make this argument. Defense counsel made the remarkable statement that the trial court gave defendant "four extra years" for mental retardation. In other words, according to defense counsel, the most reasonable construction of the trial court's comments is that the trial court determined that a minimum sentence of six years was sufficient for the predatory criminal sexual assault of a 12-year-old girl, but then decided to tack on four more years because defendant is mentally retarded.

*People v. Thompson*, 222 Ill. 2d 1, 45 (2006). The trial court is not bound by the State's sentencing recommendation. *Streit*, 142 Ill. 2d at 21-22. Moreover, neither the existence of mitigating factors (see *People v. Garibay*, 366 Ill. App. 3d 1103, 1109 (2006)) nor the absence of aggravating factors (see *People v. Redmond*, 265 Ill. App. 3d 292, 307 (1994)) obligates the trial court to impose the minimum sentence. We will not reverse a sentence unless it represents an abuse of discretion. *People v. Lantz*, 186 Ill. 2d 243, 261 (1999). A trial court abuses its sentencing discretion when the penalty imposed is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense. *People v. Stacey*, 193 Ill. 2d 203, 210 (2000).

I can find no abuse of discretion in the manner in which the trial court arrived at its sentence. Defendant committed a very serious offense for which the legislature has determined that a maximum sentence of 30 years' imprisonment is appropriate. The majority is simply incorrect that there was no evidence to support the trial court's future-dangerousness finding. Defendant's own evidence showed that he felt more comfortable with and spent more time with minors who were closer to his mental age than to his chronological age. According to the principal at defendant's junior/senior high school, defendant's friends were much younger students who enjoyed spending time with defendant because he was older and had a car. Defendant was charged with three counts of predatory criminal sexual assault against a 12-year-old girl, D.R., and pleaded guilty to one of the counts. The victim's descriptions of the three instances of sexual conduct were before the trial court at sentencing. In D.R.'s statement, she explains that, on the first occasion, defendant reached into D.R.'s pants and moved his fingers up and down inside her vagina. D.R. stated that she was not expecting defendant to do this and it made her feel scared. On the second occasion, defendant had D.R. in his car, and he asked her if she wanted to "give him head." D.R. explained that she did not know what to say to defendant, and that she did not know if she was ready for this. Defendant kept repeating, "it's up to you," and D.R. finally said, "o.k." D.R. explained what happened next:

> "Then he started unzipping his pants. *** Then he took my head and put it down to his penis. *** He just pushed me

> down. *** I tried to get up, but *** his hands were still there
> and I tried to get up and then he finally let go."

When asked how this made her feel, D.R. explained, "I was kind of scared a little after that, too." On a third occasion, defendant again placed his fingers in D.R.'s vagina. Defendant was warned to stay away from D.R. by his own parents and by D.R's parents, and the court ultimately entered an order of protection against defendant. Defendant met with D.R. again while the order of protection was in effect and pleaded guilty to violating the order.

Given this evidence, I fail to see how the majority could possibly conclude that there is no evidence supporting the trial court's determination that protection of the public was necessary. Here, the fact that defendant violated a restraining order prohibiting him from having contact with the minor that he had sexually abused sufficiently supports the trial court's determination. Moreover, defense counsel expressly conceded at the hearing on the motion to reconsider that defendant "is subject to being influenced and led down the wrong path because of his intellect."

The majority objects to the trial court's description of defendant as a predator and argues that it was the 12-year-old victim who pursued defendant. There are two problems with this contention. First, the name of the offense that defendant pleaded guilty to is "predatory criminal sexual assault of a child." 720 ILCS 5/12–14.1 (West 2006). Whatever preconceived notions the majority may have of the meaning of the word "predator," the fact is that Illinois law defines a person who commits this offense as a predator. Thus, I fail to see how we can fault the trial court for believing that the community at large would view someone who pled guilty to "predatory criminal sexual assault of a child" as a predator. Much more importantly, however, although the majority might be correct that D.R. pursued a *relationship* with defendant, there was evidence before the trial court showing that it was defendant who pursued the *sexual* and *criminal* aspects of the relationship. In D.R.'s statement, she said that she was not expecting defendant to place his fingers in her vagina and that this scared her. Her statement further shows that defendant goaded her into performing oral sex on him and that he forcibly held her head down on his penis when she tried to get up.

D.R.'s statement renders unobjectionable the trial court's use of the term "predator."

The majority also claims that there is no evidence to support the trial court's conclusion that members of the public might be terrified of defendant. The trial court's comments were just a matter of common sense. Consider how a parent in the community would feel knowing that defendant was hanging around children, that he had driven one of them around in his car, placed his fingers in her vagina and scared her, goaded her into performing oral sex on him and forcibly held her head down on his penis, and then violated a restraining order requiring him to stay away from her. Are my colleagues seriously arguing that it was improper for the trial court to consider that a member of the public, particularly a parent, might find the above facts frightening or that the community was in need of protection?

Finally, the majority misses the point when it holds that defendant's violation of the restraining order was entitled to no weight because the contact was instigated by the victim and the meeting took place in a public park. The point of defendant's violation of the restraining order is that it showed that all efforts to keep defendant away from the minor whom he had abused were futile. This finding was proper under the very law that the majority establishes. The majority specifically holds that mental retardation may be considered as aggravating if it leads to a lack of control on defendant's part. Slip op. at 16. The evidence unquestionably supported the trial court's finding that defendant had not shown an ability to control himself and that all efforts to keep him away from the victim had failed. Moreover, the last time that the victim had pursued a relationship with defendant, defendant turned it into a criminal sexual relationship. The trial court could rightly be concerned that nothing was going to keep defendant away from the victim and that there was a danger of more abuse occurring. One could even conclude that such a recurrence was likely, given defense counsel's concession that defendant "is subject to being influenced and led down the wrong path because of his intellect."

My colleagues have undoubtedly demonstrated that there is more than one way to look at this evidence. They have also ably demonstrated that they would have weighed the evidence differently

than did the trial court and that they would have imposed a lesser sentence on defendant. This is no basis upon which to reverse a sentence. *Streit*, 142 Ill. 2d at 19. What my colleagues have *not* done is to demonstrate that the trial court's decision was an abuse of discretion. The trial court clearly gave mitigating weight to defendant's mental retardation, but believed that a sentence longer than that recommended by the parties was necessary for the protection of the public. The sentence the trial court arrived at was 20 years below the maximum and only 4 years above the minimum. There was evidence supporting the trial court's decision, and there is no basis for this court to interfere with this sentence.

## CONCLUSION

Today's opinion will send the unfortunate message that results matter more than the law. A straightforward application of well-settled law leads to the unmistakable conclusion that the appellate court's judgment must be affirmed. Instead, the majority reverses and repeatedly ignores basic rules of appellate procedure along the way. Defendant clearly forfeited his issue, and this court should require him to meet his burden of establishing plain error. The forfeiture analysis the majority uses here is unprecedented and severely undermines the plain-error rule. Moreover, the forfeiture analysis the majority uses is based on an argument defendant never even made. When the majority reaches the merits of the issue, it once again goes beyond what the defendant argued and decides an issue other than the one defendant raised. I would hold that defendant forfeited the only issue he is raising on appeal, and I would affirm the appellate court's decision.


JUSTICES GARMAN and KARMEIER join in this dissent.


JUSTICE KARMEIER, also dissenting:

I join in Chief Justice Thomas' well-reasoned dissent, and I write separately only to add a few observations of my own.

In recent years, this court has, with increasing frequency, strictly applied principles of procedural default in cases that have come before us. Some might argue that the court has developed a

framework that is *too* rigid, restricting our own ability to reach important issues, and consequently depriving bench and bar of much needed guidance. Advocates of that position might well point to this court's supervisory authority as enabling our review of issues when and where we see fit. See *In re Estate of Funk*, 221 Ill. 2d 30, 96-98 (2006) (our supervisory authority is "unlimited in extent and hampered by no specific rules or means for its exercise" and thus allows the court to "look beyond considerations of [forfeiture] in order to maintain a sound and uniform body of precedent or where the interests of justice so require"). However, whether one is an adherent of one position or the other, it is disingenuous to mischaracterize an issue simply in order to reach it, and that is what I believe the majority opinion does here. In that respect, this is a watershed case and a pivotal precedent. Henceforth, this court will have much greater latitude to reach issues, because, as Chief Justice Thomas notes, "the argument does not have to be the same, it merely has to relate to the same subject." Hereafter, a claim that the circuit court erred in sentencing *arguably* preserves every conceivable sentencing issue. This decision will also make life easier for litigants, as it will allow for much abbreviated postjudgment motions. In any event, it is clear that the trial judge in this case was not given the opportunity to address the specific error which defendant now alleges on appeal. Pursuant to one line of authority, the consequence of that omission is issue forfeiture. At the least, this disposition calls those precedents into question, and I foresee this case being cited frequently by those who would seek to avoid the consequences of procedural default.

Beyond that, in my view, the majority improperly reweighs the evidence and substitutes its judgment for that of the trial court (see generally *People v. Streit*, 142 Ill. 2d 13, 19 (1991)), justifying that action under the guise that the circuit court considered an improper aggravating factor in sentencing. Apparently, the precedent we can take from *that* portion of the majority opinion is that a sentencing court may not consider a defendant's willingness to violate an order of protection as evidence of future dangerousness. Disregard of court orders counts for nothing. As Chief Justice Thomas amply demonstrates, there *was* evidence of future dangerousness. The majority opinion muddles the difference between the *evidence* before the circuit court and the *conclusions* the court ultimately drew, and

thus the majority improperly reweighs the evidence. Since the majority obviously believes that the defendant's sentence was excessive, and that a six-year sentence of imprisonment is appropriate, the court should simply impose that sentence.

By remanding this cause for resentencing before a different judge, the majority not only wastes judicial resources, but also administers an undeserved slap in the face of the sentencing judge, who did nothing to warrant such treatment. To the contrary, the record shows that the sentencing judge conscientiously weighed the appropriate aggravating and mitigating factors when he imposed the defendant's 10-year sentence. Certainly, this case is nothing like *People v. Dameron*, 196 Ill. 2d 156 (2001), the case cited by the majority to support its action, and it is not surprising that the majority does not discuss *Dameron*. In *Dameron*, the sentencing judge repeatedly referenced evidence and sources not of record in handing down a sentence of death. Given the facts of this case, *Dameron* is no authority for the assignment of resentencing to a different judge.

The court today effectively eviscerates its own procedural default jurisprudence, it ignores evidence of future dangerousness, and it sets an ill-advised precedent insofar as it requires sentencing before a different judge under these circumstances. Thus, I cannot subscribe to the majority opinion.

CHIEF JUSTICE THOMAS and JUSTICE GARMAN join in this dissent.