Order filed March 10, 2026.          2026 IL App (5th) 240586-U
Modified upon denial of
rehearing April 13, 2026.          NO. 5-24-0586

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 23-CF-745 |
| | ) | |
| GENNELL D. CARTER-TUCKER, | ) | Honorable |
| | ) | Roger B. Webber, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE McHANEY delivered the judgment of the court.
Presiding Justice Cates and Justice Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*: Where the trial court imposed an unauthorized term of mandatory supervised release and relied on an improper statutory factor in aggravation, we reverse the defendant's sentence and remand for a new sentencing hearing.

¶ 2                              I. BACKGROUND

¶ 3    This case resulted from a family feud fought on social media. On one side was Gennell D. Carter-Tucker (the defendant) and her sisters, India Carter (Carter) and Jamir Folks (Folks). On the opposite side was the defendant's aunt, Markeetia McFarland (Markeetia) and her children, Dynasty Craig (Craig) and Linnell Blount (Blount). Both sides lived in close proximity in Champaign, Illinois. The record does not include evidence about the feud's origin and lacks detail regarding incidents between the feuding families before the events that gave rise to this case.

1

¶ 4    Someone from Markeetia's side made a Facebook post mocking the death of the defendant's daughter, who died from a heart defect shortly after birth: "TELL [Gennell] go dig her DEAD A$$ BABY UP. LMAOOO that's why the luh ugly gremlin [motherf****r] ain't make it pass earth that wasn't GOD'S work b[i]tch that was the DEVIL[']S that's why he snatched her luh ugly a$$ up you ain't drop no pic of her I'm knowing she was just as ugly as the rest LMAOO." After receiving a screenshot of this post, the defendant sent a private message to her sister stating, "Come over so we can go busting mfs shit [in]."

¶ 5    On May 21, 2023, the defendant posted a collage of images related to the 1997 death of Markeetia's six-year-old son, who overdosed on pills. The images included an open bottle of pills, an open casket, a shirt with "rest in peace" written on it, and a description of the gates of hell.

¶ 6    On May 25, 2023, officers were dispatched to the Prairie Green Apartment Complex in Urbana to investigate an alleged mob action. Officers made contact with 16-year-old Craig, who had scrapes, bruises, and a black eye. Craig stated that she was walking through the apartment complex when the defendant and her sisters, Carter and Folks, jumped out of a car and began beating her. Both Craig and Carter said the beating was motivated by the recent social media rancor. A video of the attack on Craig was recovered from the defendant's Facebook account, plus an exchange in which the defendant stated, "All them hoes getting clapped 1 down 8 more to go."

¶ 7    After the attack on Craig, Carter dropped the defendant off and drove back to her own apartment complex. Upon arrival, she saw that a large threatening crowd had gathered outside. Carter retrieved the defendant and upon their return, the two opposing sides began yelling at each other. Despite nearby police presence, Carter believed the situation was escalating and decided to leave. As she was driving away, Carter heard gunshots from inside her car. She believed the shots were fired by the defendant, who was sitting in the back seat. Officers on the scene reported 8 to

2

10 gunshots were fired from the rear passenger side of the vehicle, where the defendant was seated. The gunfire was directed toward the crowd as Craig drove away. Blount, who was standing about 100 feet away at the back of the crowd, suffered a gunshot wound to the head. He survived but sustained severe injuries.

¶ 8     The defendant was charged by information with attempt murder (720 ILCS 5/9-1(a)(1) (West 2022); *id*. § 8-4(a)), unlawful possession of weapons by felons (*id*. § 24-1.1(a)), and aggravated battery with a firearm (*id*. § 12-3.05(e)(1)). The defendant was also charged in a separate case with mob action (*id*. § 25-1(a)(1)) for the attack on Craig.

¶ 9     On January 8, 2024, the defendant entered an open plea of guilty to aggravated battery with a firearm (a Class X felony) in exchange for the State's agreement to dismiss the remaining counts. The State also dismissed the mob action case involving Craig (case No. 22-CF-1318) and another mob action case involving a victim named Shateka Thatch (Thatch) (case No. 23-CF-920). The defendant was on pre-trial release in the Thatch case at the time of the Blount shooting.

¶ 10    On February 21, 2024, the case proceeded to sentencing. The defendant's pre-sentence investigation report (PSI) disclosed the following information. The defendant has six surviving children with two fathers. One of the children is serving an 11-year prison sentence for drug induced homicide. Another child has three domestic violence cases where the defendant was the victim. The defendant was molested by a relative at age six. At first, her family did not believe her, and she was forced to see her abuser at family events.

¶ 11    The PSI revealed that the defendant "undoubtedly suffered" from mental issues from an early age. DCFS records reported that she was exposed to physical aggression and sexual abuse throughout her life. The defendant had a learning disability and attended a Special Education School. She dropped out of school in the ninth grade after becoming pregnant. The defendant was

3

hospitalized at age 13 for suicidal behavior that included jumping from a second story window. She was hospitalized a year later for suicidal behavior and talking to herself. She advised hospital staff that she had recently been raped. There were two other hospitalizations regarding mental health issues. She was diagnosed with mood disorder and posttraumatic stress disorder.

¶ 12    During its argument regarding factors in aggravation, the State presented the following testimony about the dismissed mob action case involving Thatch. On August 1, 2022, Thatch attempted to defuse a confrontation between her son's girlfriend and two other females, one of whom was the defendant. The defendant, pregnant at the time, turned on Thatch and struck her with a phone, a grilling utensil, and a hammer. When Thatch's son tried to intervene, a male associate of the defendant threatened him with a gun. Thatch suffered a broken thumb, lacerations to her hand requiring stitches, and bruising on her body.

¶ 13    The defendant's criminal history consisted of a juvenile adjudication for felony theft and an adult conviction for felony aggravated battery for which she was placed on probation. She also had been sentenced to probation for a Class 4 felony mob action case as an adult. Her criminal history included three misdemeanor convictions for assault, battery, and driving while license suspended.

¶ 14    The State argued that the provocation from the Facebook post did not justify the defendant's violent response. Additionally, the State contended that the defendant's repeated failure to take advantage of prior rehabilitation opportunities, such as anger management and mental health treatment, demonstrated that her conduct was not the result of circumstances unlikely to reoccur. The State argued that the fact the defendant committed the instant offense while she was on bond for the Thatch case was a statutory aggravating factor. The State asked the court to impose a prison term from 25 to 30 years.

4

¶ 15    The defendant made a statement in allocution:

"THE DEFENDANT: Dear Honorable Judge Webber, I am writing you to ask if there is any chance of me getting the opportunity to eventually make it home before my children are grown. I have six small children, ages 11, seven, six, three, two, and one years old [*sic*]. They are currently living with my mom, but I don't know how much longer that will last, because my whom's [*sic*] health is failing her, and she's trying to hold on to her job at home with no help with the children. Taking care of my kids is—alone is becoming a burden. My children's dad health is failing as well. He has renal kidney failure, and he's always in and out of the hospital for weeks at a time, and back and forth to dialysis throughout the week, and he is not able to take care take care of them either.

I know the charge I have is serious and that I have to deal with it. I'm humbly asking for another chance to take that burden away from my mom and get back to raising my babies as soon as I can.

Your Honor, I am truly sorry and remorseful from the bottom of my heart, and I own up to my actions in this case and take full responsibility for my actions. Your Honor, I was a good mother to my children before all of this happened. I had my own place, vehicle, full-time job, and my kids were in school and day care. My children are lost and confused, not understanding why I've abandoned them. My mom is struggling to take care of my kids without me. My seven-year-old son is acting out at home, and now is currently attending weekly counseling due to me being gone, and I blame myself for that and no one else. I do not want my child to grow up and make the same mistakes I have made, and I do not want my children to become wards of the state due to the circumstances. I'm pleading

5

with you, your Honor, and throwing myself at the mercy of you and the court, asking you to please allow me the chance to get back home to my motherly duties as soon as I can.

I made huge mistakes, and I am very sorry to my victim and his family. If I could go back and change things, I would. I would have walked away. I would not have hurt anyone. I am now here facing six to 30 years while my kids are out there, wondering when or if I'm getting back to them. I feel bad about myself as a mother, and I have been living with that every day since I've been incarcerated. Now all I can do at this point is try to make things right in my victim's life, my kids' live [*sic*] and my own. Once my sentence is served, I have a reentry program coordinator, and also a family specialist that will both help me gain employment, housing, and much more once I'm released from prison."

\* \* \*

If you allow me the chance today, I give you my word that I will serve my time, come home, and abide by all rules and regulations, and will most certainly not break the law again, and I will be extremely grateful to you and the court. Thank you for your time and consideration."

¶ 16    In mitigation, defense counsel emphasized the defendant's history of trauma, abuse, and mental illness as documented in the PSI. Counsel argued that the defendant's mental health issues and provocation from Markeetia's Facebook post should be considered as mitigating factors. Counsel contended that the defendant had accepted responsibility by pleading guilty and expressed genuine remorse in her statement in allocution. Additionally, a lengthy sentence would impose a hardship on the defendant's young children. Counsel asked for a sentence on the low end of the sentencing range.

¶ 17    After arguments of counsel, the trial court made the following findings and comments:

6

"[T]he court has considered the presentence investigation report, the evidence presented, the defendant's statement in allocution, the arguments of counsel, all statutory and non-statutory factors in aggravation and mitigation, whether specifically mentioned or not, as well as the history and character of the defendant, having due regard for the seriousness of the offense, and with the objective of restoring the defendant to useful citizenship."

The court found as an aggravating factor that the defendant's conduct caused or threatened serious harm. "I recognize *** that to some extent that is considered in the charge itself. *** [E]ight to ten shots were reported as being fired at a very large crowd. *** The defendant does have a significant history of prior delinquency or criminal activity. The court is required to consider the sentence that is necessary to deter others ***." The court then stated: "I believe *the defendant was on pretrial release* for one of the other charges that I heard about when this occurred, and *that is another factor in aggravation*. (Emphases added.)"

¶ 18    With respect to factors in mitigation, the trial court began by stating: "To describe the defendant's early childhood and her life up to this point as traumatic or extremely difficult would be an understatement and not even come close to describing what she has gone through with the trauma described in the presentence report." Referencing Markeetia's Facebook post, the court stated, "I can only imagine that this is horrific, and would motivate even the calmest person to want some form of revenge, or to do something. So[,] I do find the defendant acted under strong provocation."

¶ 19    The trial court continued by stating, *inter alia*, the following:

"Given the history of what I heard, *the fact that she was on pretrial release at the time of this incident*, the fact that I heard about another mob action when Ms. Carter-Tucker

7

didn't use a gun, but used, I believe, a hammer, on another occasion, or some kind of grill implement to cause a pretty significant cut on the hand of another person.

\* \* \*

The video I saw showed people kicking a person that was on the ground. That is just the most senseless kind of mob violence that the court can imagine, so I can't find that this is a result of circumstances unlikely to recur.

\* \* \*

There is significant history of trauma and abuse in this person's early childhood and growing up in her life. That is well-documented evidence of serious mental difficulties, if not mental illness, which the court can only presume contributes to this behavior. The defendant is the mother of several children whose well-being will be seriously and negatively impacted by her absence.

\* \* \*

She has pled guilty. She has accepted responsibility for her conduct[.]

\* \* \*

I consider the plea of guilty and the complete acceptance of responsibility to be a very significant factor in mitigation as well. The prior record and the facts and circumstances of this case as well as the other mob action beating that I saw would certainly justify a sentence in the range that the state's attorney's [*sic*] suggested. The childhood and life of Ms. Carter-Tucker up to this point would—would certainly tend to support a sentence closer to the minimum range. (Emphasis added.)

\* \* \*

"[M]ental health issues, substance abuse issues are a bit of a double-edged sword when it comes to sentencing. On the one hand, they engender sympathy and should be considered a significant factor in mitigation on behalf of the defendant. On the other hand, they could be considered as something that makes it much more likely for that person to be a threat to the public in the future. Given the nature and circumstances of this case, the history and character of the defendant, the court does believe it needs to consider protection of the community and the deterrent effect almost as equally as it does the acceptance of responsibility in pleading guilty.

Balancing all those factors, I believe that the most appropriate sentence in this case is a sentence of 18 years in the Department of Corrections, so that will be the sentence of the court. That will served at 85 percent, and that will be followed by a period of mandatory supervised release of three years."

Following the denial of her motion to reconsider sentence, the defendant timely appealed.

¶ 20                                   II. ANALYSIS

¶ 21    On appeal, the defendant raises four claims of error committed by the trial court: (1) misapplication of the mitigating factor of provocation, (2) misapplication of the mitigating factor of mental illness, (3) improper consideration of the defendant's pretrial release for another crime that did not result in a conviction as an aggravating factor, and (4) imposing a period of mandatory supervised release (MSR) longer than allowed by statute.

¶ 22                                     A. MSR

¶ 23    The trial court sentenced the defendant to a 3-year term of MSR. The State concedes that this was error, because section 5-8-1(d)(1.5) of the Unified Code of Corrections (Code) (730 ILCS 5/5-8-1(d) (1.5) (West 2022)) subjects a defendant convicted of a class X felony to an MSR term

of 18 months.. Section 5-8-1(g) of the Code (*id*. § 5-8-1(g)) clarifies that the 18-month MSR term applies to a defendant convicted of a class X felony on or after July 1, 2021. Because the defendant was convicted after July 1, 2021, the defendant argues the applicable MSR term was 18 months, not 3 years. However, section 3-6-3(a)(2)(ii) of the Code (*id*. § 3-6-3(a)(2)(ii)) exempts the class X felony of aggravated battery with a firearm, so the correct MSR term of the offense of which this defendant was convicted, remains 3 years.

¶ 24    After the initial filing of this order, the State filed a timely petition to reconsider this court's ruling. Upon our review of the petition for rehearing, we modify, in part, the ruling made in our initial order regarding the defendant's MSR term. With the exception of this modification, the petition for rehearing is denied.

¶ 25                                B. Provocation

¶ 26    The defendant argues that instead of mitigating her sentence based upon the strong provocation caused by the Facebook post about her deceased child, the trial court aggravated her sentence by improperly focusing on the defendant's reaction to that offensive post. Pursuant to section 5-5-3.1(a)(3) of the Code (*id*. § 5-5-3.1(a)(3)), the trial court shall accord weight in favor of minimizing a sentence of imprisonment where the defendant acted under a strong provocation.

¶ 27    In support of her argument, the defendant relies upon *People v. Calhoun*, 404 Ill. App. 3d 362 (2010). In *Calhoun*, the defendant was bathing her one-year-old daughter when she noticed the child's "private part was open." The defendant explained that her daughter's vagina appeared to be abnormally large, as if it had been stretched. After some investigation, the defendant extracted an admission from an adult male named Alonzo that he "did it." It was also discovered that Alonzo had done the same thing to the daughter of the defendant's neighbor. The defendant and other co-defendants then subjected Alonzo to a prolonged period of brutal torture resulting in his eventual

10

death. The defendant was convicted of first degree murder and sentenced to a maximum term of 60 years' imprisonment, plus a consecutive term of 7 years for kidnapping.

¶ 28 The appellate court agreed that the trial court refused to consider the fact that the victim had sexually assaulted the defendant's one-year-old daughter as mitigating provocation and instead, used that fact as an aggravating factor because the defendant "unilaterally decided to take the law into her own *** hands." The court specifically noted: "[T]he trial judge chose to focus on the defendant's actions responding to that provocation as vigilantism, thereby warranting higher punishment." The court found that the trial judge had a duty to consider that the vigilante justice taken by the defendant was committed in response to provocation that objectively would be as extreme as any mother of any child could sustain. The court also noted that: "[I]n failing to give due recognition to the provocation, the trial judge failed to recognize that in light of such provocation, there was very little, if any, likelihood that defendant would be a recidivist offender, so as to permit the full breath of her rehabilitative potential."

¶ 29 We find *Calhoun* to be readily distinguishable. First, the sentence imposed by the trial court in *Calhoun* was the 60-year maximum. Here, the trial judge imposed a sentence in the middle of the sentencing range. Further, there is a *vast* difference in the level of provocation caused by viewing physical evidence of sexual assault to a one-year-old child and viewing an offensive Facebook post.

¶ 30 The trial court is granted great deference in sentencing a defendant, and a reviewing court will not overturn the trial court's determination absent an abuse of discretion. *People v. Kolzow*, 301 Ill. App. 3d 1, 8 (1998). "In considering the propriety of a sentence, the reviewing court must proceed with great caution and must not substitute its judgment for that of the trial court merely because it would have weighed the factors differently." *People v. Fern*, 189 Ill. 2d 48, 53 (1999).

11

However, if the sentencing judge relies on an improper factor or makes comments indicating he did not consider the statutory factors, a defendant is entitled to a new sentencing hearing. *People v. Primm*, 319 Ill. App. 3d 411, 425 (2000). Even if the sentencing judge considered an improper factor, remand for resentencing is necessary only if the consideration resulted in a greater sentence. *People v. Bourke*, 96 Ill. 2d 327, 332 (1983). In determining whether the trial court improperly imposed a sentence, this court will not focus on isolated statements but instead will consider the entire record. *People v. Ward*, 113 Ill. 2d 516, 526-27 (1986). A sentence that falls within the statutory range for an offense is presumed to be proper. *People v. Thurmond*, 317 Ill. App. 3d 1133, 1142 (2000). In evaluating whether the trial court abused its discretion, we consider the entire sentencing record rather than individual remarks. *People v. Ward*, 113 Ill. 2d 516, 526-27 (1986).

¶ 31     The record establishes that the trial court explicitly recognized the extreme nature of the provocation. The court acknowledged the cruel Facebook post mocking the death of the defendant's daughter and its emotional impact. We find that the trial court did not disregard the provocation factor, nor did it factor in the defendant's emotional reaction to that provocation as aggravating in itself. Rather, the trial court balanced the provocation against the extremely violent nature of the defendant's response, particularly in light of the existence of any ongoing, escalating feud. Accordingly, we find that the trial court did not misapply the strong provocation as an aggravating factor.

¶ 32                                C. Mental Illness

¶ 33     The defendant argues that the trial court failed to give proper weight to her mental health issue as a mitigating factor. Pursuant to section 5-5-3.1(a)(16) of the Code (730 ILCS 5/5-5-3.1(a)(16) (West 2022)), the trial court shall accord weight in favor of minimizing a sentence of

imprisonment when, at the time of the offense, the defendant was suffering from a serious mental illness which, though insufficient to establish the defense of insanity, substantially affected his or her ability to understand the nature of his or her acts or to conform his or her conduct to the requirements of the law.

¶ 34 The trial court acknowledged the defendant's "well-documented evidence of serious mental difficulties, *if not mental illness*, which the court can only presume contributes to this behavior. (Emphasis added.)" Noting that the trial court also stated that mental health issues "are a bit of a double-edged sword when it comes to sentencing," the defendant argues that the trial court improperly applied the defendant's mental health issues as an aggravating factor. The defendant relies upon *People v. Heider*, 231 Ill. 2d 1 (2008). There, our Illinois Supreme Court agreed with the defendant that the circuit court abused its discretion by improperly considering the defendant's mental retardation as an aggravating factor in sentencing. We find *Heider* to be distinguishable. The Supreme Court specifically stated:

> "[W]here mental retardation indicates further dangerousness, it is not the mental retardation that is being used as the aggravating factor. Rather, it is the future dangerousness that *results* from the mental retardation that is the aggravator. In our view, there is nothing improper in considering the effects of mental retardation in this way, so long as the evidence supports the conclusion that the defendant poses a future danger." *Id.* at 21.

The court in *Heider* emphasized that there was nothing in the defendant's criminal history that "even remotely resembled a violent crime." *Id.* at 22. Here, the defendant had a significantly violent criminal history. We find that the trial court correctly found that the defendant's future dangerousness resulted in part from her mental health issues. Therefore, there was nothing

13

improper in considering the effects of the defendant's mental health issues in this way, because the evidence supported the trial court's conclusion that the defendant poses a future danger. *Id.* at 21.

¶ 35                                  D. Pretrial Release

¶ 36    The defendant's final argument is more problematic. The defendant contends that the trial court improperly considered that she was on bond for the Thatch mob action charge as a factor in aggravation. Pursuant to section 5-5-3.2(a)(12) of the Code (730 ILCS 5/5-5-3.2(a)(12) (West 2022)), the trial court shall accord weight in favor of a term of imprisonment where the defendant was convicted of a felony committed while he was on pretrial release for a prior felony and was convicted of such prior felony. The Thatch mob action charge was dismissed as part of the defendant's plea agreement. The trial court stated, twice, that the fact that the defendant was on bond for the Thatch case was statutorily aggravating. This was clearly error.

¶ 37    Acknowledging that this issue was not preserved, the defendant asks us to review this claim as first-prong plain error. Plain error exists at sentencing when a clear error occurs, and "the evidence at the sentencing hearing was closely balanced." *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). We find that the substantial amount of both mitigation and aggravation presented at the sentencing hearing clearly establishes that the evidence was closely balanced. This conclusion is further supported by the fact that the trial court's sentence was squarely in the middle of the sentencing range.

¶ 38    The State argued at sentencing that the defendant's pretrial release at the time of the instant offense was a statutory aggravating factor. The trial court found that the defendant's commission of this offense while on bond for the Thatch case was a statutory factor in aggravation. As such, we are unable to determine from the record that the weight placed on the improperly considered

14

aggravating factor was so insignificant that it did not lead to a greater sentence. See *Heider*, 231 Ill. 2d at 21. Such a determination can only be made by the sentencing judge. Accordingly, we reverse the trial court's sentence and remand the case for a new sentencing hearing, with directions that the trial court shall not consider as an aggravating factor the defendant's pretrial release for a felony case that did not result in a conviction.

¶ 39                                    III. CONCLUSION

¶ 40      For the above reasons, we reverse the defendant's sentence and remand for a new sentencing hearing in accordance with this disposition.


¶ 41      Reversed and remanded with directions.